Sharon HUBBELL, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–77–523.

Court of Criminal Appeals of Oklahoma.

Oct. 11, 1978.

J. M. LeMasters, Jr., Checotah, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Charles Helm, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

Appellant, Sharon Hubbell, hereinafter referred to as defendant, was charged in the District Court, McIntosh County, Case No. CRF–75–9, with the offense of Unlawful Removal of Incumbered Property, in violation of 21 O.S.1971, § 1834. The case was tried to a jury, and a guilty verdict was returned. Punishment was set at two (2) years' imprisonment, and from that judgment and sentence defendant has perfected an appeal to this Court.

At the trial, Keith Burnham, President of Farmers and Merchants Bank in Eufaula, Oklahoma, the bank which claimed the security interest in the property which served as the predicate for these charges, testified that on December 9, 1974, the defendant had borrowed $1,500 from the bank on a 30 day note. In return for that $1,500, she had signed a security agreement which granted the bank a security interest in a 1972 Chevrolet pickup truck. The defendant did not have the title to the truck, and she called home for the serial number. She gave as her address a post office box number. Burnham testified that granting a loan in that manner was not the procedure the bank usually followed in lending money.

On January 15, 1975, the bank filed a financing statement covering the vehicle with the McIntosh County Clerk. That financing statement reflected only that the property covered was a 1972 Chevrolet truck, and did not state the serial number. Burnham testified that he had not given the defendant written permission to take the vehicle out of the county and that after being unable to locate the vehicle in the county, the bank filed charges against the defendant on January 24, 1974. Burnham testified that the bank had filed charges against the defendant in federal court as well as in state court.

Burnham also testified that he had not given the defendant a copy of the security agreement which required that she not remove the collateral from the county, nor had he explained the terms of the security agreement to her. He did say that he had handed the security agreement to her to give her a chance to read it if she wished.

R. L. Simpson, of the State National Bank in Eufaula, testified, over the vigorous objection of the defendant's counsel, about his bank's transactions with the defendant. He testified that on November 15, 1974, he authorized a loan, the collateral for which was a 1972 Chevrolet half ton pickup. The loan was made payable in 90 days, and a financing statement covering the loan was recorded in McIntosh County on November 20, 1974. On December 10, 1974, he gave the defendant another $2,000 loan, using the truck and a quarter horse as collateral. That loan was made on a 30 day note, and a financing statement was recorded on December 13. Because neither loan was paid, the bank filed both federal and state charges against the defendant. She was found not guilty of the federal charges. The documents involved in these transactions were admitted into evidence, and it is sufficient here to say only that there were serious problems with the execution of the documents. Both bankers testified that they recognized the defendant from a newspaper article about a pending television contract that she and her husband were to make with a national television network.

The defendant testified that when she walked into the banks, the employees recognized her from the newspaper article and that she told the loan officers that she needed the money to move to California on January 1 to make the television series. She said that she had expected to receive an advance from the television network. The defendant further testified that Mr. Simpson told her she would need some collateral for her loan, and she told him that all she had was her wedding rings. He said he would not take her wedding rings but asked if she had any vehicles. She told him about the pickup truck. He told her to mark the truck off the loan application when she told him that she already owed money on it. The loan application, which was made out by the defendant, shows the 1972 pickup truck written on the application and marked out. The defendant testified that Simpson had her sign the documents other than the loan application blank, and he filled them in later, putting the pickup truck down as collateral. She testified that she and Simpson talked a great deal about the television series. She said that Simpson would not let her take the papers home to get her husband's signature on them, and it appears that the defendant signed both her own name and her husband's name to the documents. Simpson admitted in court that he had told the defendant to sign both names. After getting the second loan from Simpson, according to the defendant, Simpson told her to have a good trip.

The defendant also stated that she had not talked to Burnham nor had she received copies of any of the papers she signed. She said when she went to Burnham's bank it was the noon hour, and she was told the papers would be filled in later. She also said that the bank employees she talked to asked her if she had loans any place else in town. She told them she had loans with Simpson's bank but she doubted that he would lend her any more money on just her signature. She said Burnham left to make a telephone call and returned saying the loan was approved.

The defendant went to California where she had an accident barrel racing and was hospitalized. She testified that on January 10 she called both banks and told them that she would not be getting the contract until June. She said that the people she spoke with told her not to worry. The banks denied receiving the calls from her. Between January and June, the defendant was hospitalized several times for major surgery, and by the time she was to have signed the contract in June she was in jail, because of the charges arising out of these loans. The defendant testified that she was convicted on the federal charge of falsifying a loan application for Farmers and Merchants Bank, but that that conviction was being appealed. She further testified that the local District Attorney's Office had told her they would drop charges against her if she would come back and face the federal charges. Finally, the defendant denied having any fraudulent intent at the time the truck was taken to California and further stated it had always been her intention to pay the loans, but that the banks had refused to make any kind of payment arrangements with her.

The defendant's first assignment of error is that she was twice put in jeopardy for the same offense, once by federal courts and once by state courts. The defendant was originally charged in state court on January 24, 1975. In July of 1975, she was charged in the Federal District Court of the Eastern District of Oklahoma, and she was tried in December of 1975. Immediately after the federal trial, the defendant was arrested by state agents and transported to jail in McIntosh County. On January 20, 1976, defendant filed a motion to dismiss the state charge on grounds of double jeopardy. Trial was set for March 24, 1976, but the defendant was granted a continuance in order to obtain the transcript of the federal trial, so she could press her double jeopardy claim. Defendant's counsel asserts that he made every effort to obtain a transcript but that the only copy of the transcript was with the Tenth Circuit Court of Appeals in Denver. On October 5, 1976, defendant filed a second motion to dismiss and a motion for further continuance. This motion

was argued at trial prior to swearing the jury, and the motion was overruled. On January 25, 1977, the defendant argued a motion for new trial, at which time the defendant's attorney presented portions of the transcript of the federal trial. The offer of proof was refused, and the motion for new trial denied. The defendant asserts that the denial of her motion for a new trial was error, that the denial of her pretrial motion for a continuance or in the alternative for a federal transcript at State expense was error, and that in any case the defendant was prosecuted twice for the same offense.

The State urges that a trial in federal court is no bar to a subsequent trial for the same offense in the state courts. This construction has been used by the Supreme Court of the United States in dealing with the ban against double jeopardy which is found in the Fifth Amendment to the United States Constitution. See, *United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

However, 21 O.S.1971, § 25, states that: "Whenever it appears upon the trial that the accused has already been acquitted or convicted upon any criminal prosecution under the laws of another State, government or country, founded upon the act or omission in respect to which he is upon trial, this is a sufficient defense."

In *State v. Mills,* 82 Okl.Cr. 155, 163 P.2d 558, 167 P.2d 669 (1945), this Court held that under Section 25, trial by a military tribunal barred a subsequent prosecution in the State courts for the same offense. *LaForge v. State,* 28 Okl.Cr. 37, 228 P. 1111 (1924), stated that by virtue of the section which is now Section 25, a prior trial in federal court for a liquor offense barred a subsequent suit in State court for the same offense. See also, dicta in *Griffin v. State,* 57 Okl.Cr. 176, 46 P.2d 382 (1935). Therefore, if the defendant had been tried in federal court for the same offense for which the State sought to try her, under the provisions of 21 O.S.1971, § 25, the former federal trial would bar a State prosecution.

The prosecution in federal court was pursuant to the provisions of 18 U.S.C. § 1014 (1970), which states in pertinent part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of  .  .  .  any bank the deposits of which are insured by the Federal Deposit Insurance Corporation,  .  .  .  upon any application,  .  .  .  or loan, .  .  .  shall be fined not more than $5,000 or imprisoned not more than two years, or both."

The statute upon which the State action was based is 21 O.S.1971, § 1834, which reads as follows:

"Any mortgagor or conditional sales contract vendee or pledgor or debtor under a security agreement of personal property, or his legal representative, who, while such mortgage, security agreement or conditional sales contract remains in force and unsatisfied, conceals, sells, or in any manner disposes of such property, or any part thereof, or removes such property, or any part thereof, beyond the limits of the county, or materially injures or willfully destroys such property, or any part thereof, without the written consent of the holder of such mortgage or conditional sales contract, secured party or pledgee under a security agreement, shall be deemed guilty of a felony, and shall, upon conviction, be punished by imprisonment in the penitentiary for a period not exceeding three (3) years or in the county jail not exceeding one (1) year, or by a fine of not to exceed Five Hundred Dollars ($500.00); provided, that the writing containing the consent of the holder of the mortgage or conditional sales contract, secured party or pledgee under a security agreement, as before specified, shall be the only competent evidence of such consent, unless it appears that such writing has been lost or destroyed."

The Federal Statute under which the defendant was tried prohibits making false statements on loan applications, whereas the State law proscribes removing or destroying encumbered property. Prosecution under both statutes is analogous to a prosecution for the larceny of goods and a subsequent prosecution for their sale. The same goods would be evidence in both the larceny trial and in the sale of stolen goods trial. However, the fact that some of the evidence would be common to both charges does not establish double jeopardy, because in the larceny trial there would be no need to show the sale, and in the sale trial it would be sufficient that the defendant knew or should have known that the goods were stolen, not that he stole them.

In the present case, although it appears that the same exhibits (loan applications, security agreements, financing statements, etc.) were introduced in both federal and state courts, it does not follow that the defendant was being tried twice for the same offense. Rather, in federal court, the exhibits were introduced to show that the defendant made a false statement on a loan application. In the state court the exhibits were introduced to show that the property removed by the defendant was encumbered property. The evidence necessary to prove the federal offense would be insufficient to prove the state offense and vice versa. Therefore, the trial in federal court did not bar a subsequent prosecution in state court.

The defendant objects to two of the instructions to the jury. The first of those instructions is Instruction No. 2, which reads as follows:

"The statutes of Oklahoma provide that any mortgagor or conditional sales contract vendee of personal property, or his legal representative, who, while such mortgage or conditional sales contract remains in force and unsatisfied, removes in any manner such property, or any part thereof, beyond the limits of the county, or materially [injures] or wilfully, destroys such property, or any part thereof, without the written consent of the holder of such mortgage, or conditional sales contract, shall be deemed guilty of a felony, and shall, upon conviction, be punished as provided by law, Provided, that the writing containing the consent of the holder of the mortgage, or conditional sales contract, as before specified, shall be the only competent evidence of such consent, unless it appears that such writing has been lost or destroyed."

This instruction follows the wording of the statute under which the defendant was charged. However, as was stated in *Haynes v. State,* 213 Tenn. 447, 374 S.W.2d 394 (1964), statutes such as this one are highly penal and are to be strictly construed. This Court in *Miller v. State,* 94 Okl.Cr. 198, 232 P.2d 651 (1951), stated that this statute's predecessor was enacted for the purpose of protecting mortgagees from fraud, annoyance and expense, and was intended only to give such mortgagees fair protection without imposing unnecessary harmful and burdensome restrictions on the mortgagor. That case set out a requirement that the defendant either intend to defraud the mortgagee or that the sale or removal of the mortgaged goods resulted in actual fraud to the mortgagee. Quoting *Thompson v. State,* 20 Okl.Cr. 211, 201 P. 1004, 1005 (1921), and *Carr v. Brawley,* 34 Okl. 500, 125 P. 1131 (1912), this Court stated that despite the wording of the statute, the prohibition against removing encumbered property could be waived by parol consent, and if there was parol consent, the State needed to show an actual intent to defraud in order to prove its case.

Further, in *Mays v. State,* 33 Okl.Cr. 185, 242 P. 580 (1926), this Court stated that it was probably beyond the power of the legislature to provide that one should be branded as a felon where the wrong complained of was invited by the person injured. According to the Court in that case, such an action appeared to be an attempt to force a monetary settlement by means of a criminal prosecution, a procedure which was not favored by the courts. In *Neal v. State,* 14 Okl.Cr. 121, 168 P. 247 (1917), this Court stated that the defendant should have been allowed to introduce evidence of a prior

mortgage on the encumbered property and evidence that he had permission to sell the property, because the complaining party only had rights in the property insofar as the value of the property was more than the amount of the first debt. In *Watson v. State,* 11 Okl.Cr. 542, 149 P. 926 (1913), this Court pointed out that the purpose of the statute was to protect the mortgagee from fraud, annoyance and expense, but in overturning a conviction, stated that it is a common fact of agricultural mortgages that the generally encumbered property is used in various counties in pursuit of legitimate agricultural business. In order for 21 O.S. 1971, § 1834, to be valid, we must read in a requirement of a specific intent to defraud on the part of the defendant, and the jury must be made aware by instructions that they must find that intent in order to find the defendant guilty of violating the statute.

The other instruction complained of is Instruction No. 3, which reads:

"You are further instructed that the term 'wilfully' when applied to the intent within which an act is done implies simply a purpose or willingness to commit the act referred to. It does not require any intent to violate the law or to injure another or to acquire any advantage."

While the instruction may have been a correct instruction as to the term "wilfully," it was totally inappropriate for a crime which requires a specific fraudulent intent. If this were a correct instruction, any person with an encumbered car would be breaking the law every time he or she drove that car across a county line. In a mobile society such as ours, such a construction of the law would be ludicrous.

■ The defendant next contends that the trial court erred in permitting evidence of other crimes to be introduced over the defendant's timely objection. With regard to the charges against the defendant in federal court, we agree. There is absolutely no probative value in that evidence, and the admission of that evidence could only have served to prejudice the defendant.

■ We are of the opinion that the evidence of the alleged crime committed by the defendant against State National Bank in removing the pickup truck was admissible for the limited purpose of showing the defendant's intent in removing the pickup truck to California. However, the instruction regarding that evidence is reversible error. Instruction No. 5 read in part as follows:

"You are instructed that there has been admitted evidence tending to show that another alleged crime has been committed by this defendant. You are instructed in this connection that such testimony was admitted as it may or may not tend to show a common scheme, plan or device, intent, motive, or lack of mistake."

It is basic to the law of criminal evidence that a person charged with a crime be tried only on the basis of evidence regarding that crime. In *Roulston v. State,* Okl.Cr., 307 P.2d 861 (1957), this Court quoted *State v. Gregory,* 191 S.C. 212, 4 S.E.2d 1, 4 (1939). In discussing the admissibility of evidence of other crimes, the South Carolina court said:

" 'Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. But the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny. * * * [I]f the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected.' "

Some jurisdictions have held that in order for evidence of other crimes to be admitted into evidence, the defendant must have re-

ceived notice that the prosecutor will seek to introduce such evidence; the prosecutor should specify at the time the evidence is offered the specific exception under which the evidence is being offered; the evidence must not be merely repetitive or cumulative but must be necessary to support the State's burden of proof, and must not be a mere subterfuge for pointing out the defendant's poor character; and *the jury should be admonished both at the time the evidence is given and in the instructions to the jury of the limited purposes for which the evidence is being received.* See, *State v. Prieur,* La., 277 So.2d 126 (1973); *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967). While this Court has not set out a specific procedure by which the State can seek to introduce evidence of other crimes, it is apparent that it is not the province of the jury to determine whether or not the evidence introduced meets one of the exceptions to the other crimes evidence rule, and if so, which one of the five exceptions the evidence meets.

We think the evidence of the defendant's transactions with State National Bank is admissible on the question of the defendant's intent to defraud. However, when such evidence is admitted the jury must be admonished that the evidence does not prove the crime charged, but may be used by them only to determine whether or not the defendant had the requisite fraudulent intent.

██ The defendant also contends that her conviction was contrary to the evidence. While this Court does not wish to invade the province of the Oklahoma Supreme Court in construing the law of the Uniform Commercial Code, 12A of the Oklahoma Statutes, there is evidence that the banks failed to check for prior liens, failed to require that the defendant show that she had title to the truck in question, failed to allow the defendant to take the papers home for her husband to sign, made her sign his name as well as her own, and generally did not follow accepted commercial practices. There was also evidence that the defendant was unfamiliar with commercial practices and that she depended upon the banks to tell her what she was supposed to do with regard to the loans. There is also evidence that the banks waived the requirement that the defendant keep her collateral in the county. On the other hand, it appears that there was a third bank which had rights on the collateral which was superior to the rights of either of these two banks, if indeed either of these banks had a properly perfected security interest in the collateral. Furthermore, the defendant did sign some documents which purported to grant the banks a security interest in the pickup truck. We think that the evidence would have been sufficient to put the question of whether the defendant removed the collateral from the county with the intent to defraud before the jury, had there been proper instructions on fraudulent intent.

The defendant also asserts that in entering into the questioning of the defendant and of the other witnesses, the court prejudiced the defendant's case. While it appears to us that the trial court may have aided the prosecution in its case, in the light of the rest of this opinion, we need not decide the issue. Similarly, we need not discuss the defendant's allegation that her sentence was excessive.

██ Finally, we should also note in passing that the prosecutor's remarks which, without the benefit of any evidence, were intended to make the jury think that perhaps the defendant had planted the story of the television contract in the newspaper with the intent of duping the county's banks into lending her money were highly improper and should not be made in the event the case is retried.

For the foregoing reasons, the judgment and sentence from which the defendant has appealed is *REVERSED* and *REMANDED* for further proper proceedings not inconsistent with the provisions of this decision.

The Honorable Tom R. Cornish, Judge of this Court, certified his disqualification to participate in this case and the Honorable Robert D. Sims, Justice of the Supreme

Court, was appointed by the Chief Justice to serve in his stead.

SIMS, J., concurs.

BUSSEY, P. J., dissents.